My name is Irene Sollett from the Department of Justice, representing the Secretary of Health and Human Services, and with the Court's permission, I'd like to reserve three minutes for rebuttal. Before the Court are four final decisions by the Secretary acting through the Medicare Appeals Council denying Medicare coverage for the Bio-1000 device. The MAC articulated two rationales for that decision. First, to the extent that the device was used to regenerate cartilage, it was still experimental or investigational. And second, to the extent that it was used for relief of pain of osteoarthritis, it had not been shown to be more effective than the cheaper TENS device, the TENS being the predicate device which was used in the FDA 510K clearance process. As the Fourth Circuit recently concluded in the ALMI case, consistent coverage denial by the MAC is not made arbitrary and capricious by favorable ALJ decisions in other cases. Decisions by subordinate levels of the administrative process do not bind the Secretary. The Fourth Circuit addressed this very succinctly in ALMI. It said, nowhere does any policy or regulation suggest that the MAC owes any deference at all, much less is bound by decisions of lower reviewing bodies addressing different disputes between different parties, merely because they pertain to the same device. This is essentially the same approach that the D.C. Circuit took in a slightly different Medicare context in the community care case that we cited in our brief. To conclude otherwise would essentially disable the Secretary from proceeding by adjudication in these kinds of cases, which is one of the two routes that Congress has permitted, either by adjudication or by general rule, and the Supreme Court has repeatedly recognized that. The Secretary would be required to monitor every claim, every proceeding at the ALJ level, to be aware of all those decisions so that she could address them, otherwise on pain of being bound by them and having the MAC's decision, her final decision at that level, be determined to be arbitrary and capricious. This is a serious matter in the Medicare context. There's been a lot of discussion, properly so, in this case about the size of the Medicare program, the resources required to undertake this kind of proactive monitoring of conduct at lower levels of the administrative process. I believe the latest figures I have are that in 2009, there were 36,000 ALJ proceedings in the Medicare program. Now, these are not all durable medical equipment cases, but a great number of them are. And to impose upon the Secretary the burden of monitoring those decisions and expressly dealing with any ALJ decision contrary to the outcome she reaches at the MAC level in order to avoid having that decision be determined to be arbitrary and capricious is not what the statute contemplates. It's not what the Supreme Court contemplated when it recognized the Secretary's discretion to proceed by either route. And I would point the Court, there are, of course, many, on virtually every issue that is before the Court in this case, that same issue, those same issues were before the Fourth Circuit in the Almy case. Part of the reason for that is that not only is it the same device, but there actually is one administrative decision in common in the two cases because there were claims in the 535 decision by both of the suppliers. So on one of the four cases that's before, Your Honors, in this case, that same decision was before the Fourth Circuit. The Fourth Circuit recognized the resource implications of the position taken by the suppliers, what it would require of the Secretary. It said that the supplier there seeks to impose massive resource costs on the Secretary, requiring her to reverse any decision at a lower level of adjudication, either through become precedent that precludes a different considered result in future cases before the MAC. So we urge strongly that this Court conclude, as the Fourth Circuit did in Almy, that the MAC's decisions here, which are consistent and which have been consistent about this device in every case in which the MAC has considered the coverage question for it, that those consistent decisions are not made arbitrary by favorable decisions for the supplier at lower levels. If I could turn to the question of the impact of FDA's regulatory actions with respect to this device on the Medicare coverage question. RS Medical would put the first two prongs of the three-part reasonable and necessary test standard off the table completely with respect to any device that is legally on the market pursuant to the Food, Drug, and Cosmetic Act. There is nothing in either the Food and Drug statute or in the Medicare statute that addresses the intersection of FDA action and Medicare coverage. And with the exception of one very cabined and specific category of investigational device exemption devices, there's really no regulation, either by FDA or by Medicare, that addresses this. What RS Medical relies on is a single sentence in a Federal Register Notice, which is where the Secretary said that Medicare adopts FDA determinations of safety and advocacy. Even if, and all the debate in the briefing in this case has been construing that sentence in a Federal Register Notice virtually as if it were a statute. There is, if that were the way the court decided to approach it, there is a lot of reason why the court should not read that single sentence in the Federal Register the way RS Medical would have you read it. The first reason I would point the court to is the pronouncements of the Supreme Court on the characterization of 510K clearance on the one hand and premarket approval on the other in the law and legal decisions. Those decisions can't be minimized on the ground that they deal with the question of preemption, because they were dealing with an express preemption provision in the medical device amendments, which basically says that if there is a specific Federal requirement relating to safety and efficacy, then a State can impose an additional or conflicting requirement. So the whole question in those cases was whether these processes, 510K clearance on the one hand and premarket approval on the other hand, imposed specific requirements related to safety and effectiveness. And the court concluded in law that premarket approval did not. And it, excuse me, that 510K clearance did not. And it concluded in legal that premarket approval did. And the reason was that it characterized 510K clearance as a cursory process of relatively streamlined process that was in the nature of an exemption from safety review, whereas premarket approval was safety review itself. So this distinction that the court drew between 510K clearance and premarket approval is very significant here, because RS Medical would read that line in the Federal Register determination, FDA determination regarding safety and that 510K clearance satisfied that. And that's, I think, very inconsistent with the depiction of those processes in the law and legal cases. And one other point I would draw the Court's attention to in law is the Court there particularly mentioned the fact that when FDA grants 510K clearance, and it was true of the clearance in law and it's true in the clearances that are in the record in this case, it particularly draws the supplier's attention or the sponsor's attention to the fact that 510K clearance may not be used, may not be described or promoted or advertised as constituting FDA approval. And if it is, it is the basis for a misbranding action by FDA. That same aspect of the 510K clearance process was noted by this Court in a footnote in its photometrics decision that's cited in our brief. So FDA, when it grants 510K clearance, it tells the sponsor very specifically, you may not tell the world that we have approved this product. That is not what this process is about. Even if, however, you wanted to read the sentence in the Federal Register the way R.S. Medical would have you read it and equate 510K clearance with pre-market approval, there are other reasons why it should not lead you to the result they would have you reach in this case. The MAC denied coverage here on grounds that are essentially not addressed by FDA in that 510K clearance. The device was cleared on the ground that it was substantially equivalent to a TENS device. But the MAC decisions here found, first, that it remained experimental and investigational for cartilage regeneration purposes. That FDA clearance said nothing about the effectiveness or the safety of that device for this other purpose. And secondly, the MAC decided this case on the ground that it hadn't been shown to be more effective than the TENS, the predicate device. Well, when FDA concluded that this Bio-1000 device was as safe and as effective as the TENS device, it certainly did not find that it was more effective than the TENS. So nothing about the clearance here. Yes, Your Honor. I was just going to say that even if you were inclined to equate these two processes, nothing about the 510K clearance addresses the grounds for the denials by the MAC. As you know, the district court reversed the denials of the MAC, and because of that didn't reach the sort of safe harbor, these limited liability issues. If we agree with you that the district court was wrong about the coverage decisions, do we not then, should we not remand it back to the district court to then consider in the first instance whether any of these limited liability defenses apply? That's a course that is open to the court, of course. We would urge the court to reach that issue, and the basis for that request is really what you did in the maximum comfort case. In maximum comfort, there was the same situation of the lower court not having reached the limitation of liability issue, and what the court said there as the reason why it decided to reach that issue is that the standard of review that the court would apply was de novo. The secretary had actually decided that issue, and it had been fully presented to the district court. So on those three grounds, the court elected to decide that issue, I assume as a matter of efficiency, as the appeal went forward, and that's what we would urge the court to do here. But it is certainly open to the court to remand if the court chooses to do that, and it was not decided by the district court. That issue was not decided by the district court. With the court's permission, let me just say briefly, as to substantial evidence, because the district court, in our view, went off course in its analysis of deference slash arbitrariness slash substantial evidence. It basically, instead of viewing and assessing the inconsistency question under an arbitrariness rubric, it went down the deference avenue, and then it concluded, I don't owe any deference to the max assessment of the record. So I'm going to look at the ALJ decisions that came out favorable to coverage, which are not before the court, and the ALJ decisions that denied coverage, which are before the court, and I'm going to decide which of them has more substantial evidence, which is more supported by substantial evidence. That's really not the court's task here in reviewing this record. The question is, is there evidence in the record that a reasonable person could use to come to the conclusion that the MAC did? We think the answer to that question is clearly yes. The reasons given in the decisions were not limited to the financial link between the sponsor and. . . I just have one question on that. Can't the unappealed ALJ decisions be considered final decisions of the Secretary, and could those be considered inconsistent with MAC decisions? Your Honor, they are the last word of the agency in those cases. They are binding on the parties. There is a reason why these cases are. . . they are case-specific. They. . . neither the ALJ decisions nor the MAC decisions are precedential in future cases. Each decides the record of that case that's before that. We think that the Fourth Circuit and ALMI was correct that in this appeal process set up under the Medicare statute that there was no intention, and it is indeed supremely impractical to consider decisions of lower levels to be precedential. They are binding on the parties, but they are not the Secretary's direct consideration of the merits of the device. They're decisions by a lower decision-making body. And as the Fourth Circuit recognized, to the extent that a burden is imposed on the Secretary to monitor all of those lower-level decisions at the ALJ level, of which there are thousands, to make sure that she addresses every conceivably contrary decision at the highest level, would really be an impractical burden and one that would, as the Fourth Circuit recognized, push her toward the need in order to protect herself from being considered arbitrary to deciding these matters by national policy, which, likewise, is an infeasible approach. Thank you. Thank you. Please report. I'm Debbie Parrish for the Appellee Arrest Medical. I have with me here today Sanford Pettler from Benefico. Your Honor, let me briefly start off with what this case is about and wasn't about and why I believe the Fourth Circuit got it wrong and why this case is distinct. The issue in that case was framed up as whether the agency, the Secretary, had used an improper process, the adjudicative process, to establish a policy for the Bio-1000 device. That is not how the issue is framed up in this case. In this case, the sole issue is whether this device is reasonable and necessary for the beneficiaries at issue. In this case, under the three-part test, is the device safe and effective? Is it not experimental and investigational? And is it appropriate for these particular beneficiaries at issue in here? And Judge Layton did consider all of the points raised in the district court in Maryland, and he reconsidered his decision after the Omni case came back out and conducted oral argument. But even then, Judge Layton, who appropriately defers to the government, found that he could not give deference to the Secretary's decision because they were so egregiously arbitrary and capricious and not supported by substantial evidence. And so he did not have anything to defer to, essentially, Your Honors. Okay, let me take each of those issues. Is the device safe and effective? The Secretary's clear statement, which he has repeated in 1989, 1995, and 2003, is that she, the Secretary, for CMS purposes, CMS, adopts the FDA's determination of safety and effectiveness. It's a clear declarative statement, and if you look at the Federal Register discussion about it, it is clear that she adopts that determination regardless of which process it used. And it's also reflected in the Secretary's conduct. Never before has the Secretary come before this Court, and neither has she disavowed that very public statement, nor has she asked the Court to affirm a denial for an unclear device, for a device that wasn't clear, that was safe and effective by the FDA. That has never happened before. The second issue, is the device experimental and investigational? The touchstone of that is, has it achieved acceptance within the medical community? And that's clear also for the cases. And, Your Honors, I think Judge Layton said it best here. This Court knows not only the studies, but the frequent payments made by Medicare itself, as well as evidence that more than 1,500 commercial payers and numerous workers' compensation plans have covered the device. The Bio-1000 has been prescribed in all 50 states. Taking into account the broad range of evidence available, the Secretary's finding that the Bio-1000 is not widely accepted as a treatment for osteoarthritis of the knee was not based on substantial evidence. Your Honor, this device has been prescribed by thousands of doctors in all 50 states, Puerto Rico, the U.S. Virgin Islands, and Guam. It's hard to imagine how much broader acceptance can exist for such a device. That's the second prong. And the third prong is, is it appropriate for this particular beneficiary? She never got to that determination in any of these cases. Now, are these decisions consistent with the Secretary's other decisions? And, Your Honors, I think the Fourth Circuit got wrong on these points. On the first point, the Fourth Circuit said only the Max decisions are the Secretary's decisions. That is incorrect as a matter of the Medicare regulations. The Secretary's ALJ decisions also constitute the Secretary's final decisions. And the Court just said, well, that's an immaterial inconsistency. Your Honor, before these decisions were rendered, well first if I look at just the record that was before the MAC, only favorable ALJ decisions were in the administrative record. However, the Secretary then tried to press upon, Your Honors, the entire corpus of cases that were rendered with respect to this device. And before these decisions, there were 124 decisions, final decisions of the Secretary finding that this device was reasonable and necessary, safe and effective, and covered for those Medicare beneficiaries. It's difficult to imagine that 124 pronouncements by the Secretary is an immaterial inconsistency. The other thing that Judge Layton looked at was the code, the HCPCS code. Now, to get a code that is a determination is a very high bar. That is a code that allows a supplier to bill Medicare for a particular device. The bar is extremely high. If you actually look at the HCPCS flow decision tree, which is an administrative record at 21-899, you will see that to get a code CMS necessarily, regardless of what the FDA did, necessarily determined the device was safe and effective and significantly different from, in this case, the TENS device and had to achieve substantial adoption to warrant a code. I know the Secretary presses upon you and says Medicare is a very large program. That is correct. However, every year the number of codes that are issued for medical equipment is extremely small. And, in fact, the year that this code was issued, only two were issued. And, in general, only five were issued. It is an extremely high bar to get a code, which the Fourth Circuit simply said, that's simply to facilitate billing. It also said that doesn't resolve the issue of coverage. And I agree, Your Honor. There's still a question or issue about is it appropriate for a beneficiary. But that is certainly a significant indication. Judge Layton said that, unfortunately, it appeared the Omnicourt looked at these decisions in a vacuum and dismissed all the other agencies' pronouncements and actions indicating the device. And they were very consistent. The MAX statement that the device was not safe and effective, I mean it was experimental and investigational, was the sole pronouncement that this device did not work. They looked at the HCPCS code. They also looked at a specific directive that CMS issued to the four contractors. The Fourth Circuit said some contractors were paying for this device. That's wrong, Your Honor. All the contractors were paying for this device. And even if you look in the ALJ decisions, they even conceded that the vast majority of claims for this time, when these devices were provided in 2006, the vast majority of claims for this device were paid. And so the Secretary, in that directive, ordered the contractors to pay under individual consideration. If this device was not safe and effective, if it was experimental and investigational, the contractors would not have directed, the Secretary could not have directed the contractors to pay for this device under individual consideration. Also, some of the judges have retained independent experts. And three independent experts from HHS have all stated this device is safe and effective and not experimental and investigational. It's interesting. In her papers, the Secretary tries to recast the basis of denial as they were denied because the device doesn't grow cartilage. That's not why the device was sold, and that's not a position the appellee has ever taken. The clear indication is for pain and symptoms for osteoarthritis of the knee and for overall improvement of the knee, not to grow cartilage. The appellee here did not market that device. And if that had been the touchstone, as Judge Layton said, that would have been an accurate characterization. There isn't sufficient evidence it grows cartilage. I'm not quibbling with that, and that's not the basis of what the MAC's decisions are. They simply broadly said. Let me ask you, how is the device different from a TENS unit then? If we're not talking about growing cartilage, how is it different? The device is actually cleared for pain and symptoms and for overall improvement of the knee. The exact mechanism of action is not known. There's not strong evidence that the Secretary looked for to make that type of statement. But there was the evidence for the FDA and for CMS to say that this device works functionally different, has a different purpose than the TENS device. That was required, a required determination decision to even get the HCPCS code, Your Honor. To get the FDA clearance, didn't your folks say this was basically like a TENS device?  You don't have to go through all the hoops. However, the FDA cleared it for a broader indication than the TENS device. TENS is only cleared for pain, and this device is cleared for pain and symptoms and for overall improvement of the knee. I guess I'm not catching the distinction. You're not cleaning cartilage. No. The TENS is cleared for pain. This is cleared for pain and overall improvement. Symptoms. What does that mean? Other aspects of having osteoarthritis of the knee other than pain, Your Honor. There's swelling. There's heat. There's other conditions associated with osteoarthritis of the knee. While I've got the floor, let me ask you two other questions if I may, Ms. Parrish. First, what's the status of all knees? Is there a cert petition pending or contemplated, do you know? I understand that, Your Honor, that there is one they believe that is being prepared, Your Honor. I believe the petition has to go in tomorrow. Okay. That's in the works, I guess. Secondly, following up on the question I asked Ms. Sollett, if we were to agree with her on this, would the record permit us to deal with the limited liability issues or would we have to remand it for further development of the record? I believe, Your Honor, if you looked at how arbitrary and capricious these approvals are, you would find that there is no way a beneficiary or supplier could have possibly have known that the device for the Munset issue in this case would not be covered. So I think I'm hearing you saying we wouldn't have to remand it, we could deal with it here. Correct, Your Honor. Okay. Thanks. That's all the questions I have. Thank you. Again, Judge Layton, again, also looked at other issues that the fee schedule also showed that the CMS considered to cover. And then finally, the Secretary has now taken the position that the MAC has been consistent. The MAC has not been consistent in these decisions, Your Honor. In fact, two months before these two MAC decisions, the MAC ordered that additional repayment be made for this device. And the Secretary tries to say, oh, well, that issue wasn't before us. The issue of coverage of a medical device is always before the MAC. If an appellant does not raise it, the MAC can raise it sua sponte. But never once in seven years has the Secretary sought to reverse any of the favorable ALJ decisions, which are the Secretary's final decisions on the issue. She has not participated in a single hearing. And that failure by the Secretary to take any action to ensure consistency through the adjudicated process or to make it consistent with all of her other actions and all of her other statements. And again, Judge Layton was terribly disturbed by the fact that every other pronouncement and those pronouncements by individuals within the agency that do have expertise have all made statements and taken actions consistent with coverage of the device. And he found that these sole decisions stood alone relative to every other action of the Secretary with respect to this device. One beneficiary who has a claim in this case, Your Honor, actually had multiple dates of service paid without necessity of appeal, then had other dates of service paid through the appeal process. So that beneficiary has this decision, saying the device doesn't work at all, not only doesn't work for her, but doesn't work at all, and has a final Secretarial decision saying that it does work and it's covered for her. I don't know how much more clear on arbitrary and capricious. It's the same patient, same knee, same device, Your Honors. But again, it would not result in a massive outlay of resources. The MAC simply has never sought to take any action on all of these favorable decisions. Let me ask you about acceptance in the medical community. I know the district court noted the fact that there were other insurers that covered the Bio 1000 as support for his decision. But I didn't think that's how acceptance in the medical community is established under Medicare. From what I read, it seems like acceptance in the medical community is established through scientific data and research studies and peer-reviewed journals and consensus of medical expert opinion, and medical opinion derived from consultations with medical associations or other experts. So I guess, can you talk about that a little bit? Yes, Your Honor. The acceptance within the medical community is generally is this accepted by the medical as part of the standard of care, part of the armamentarium in this case to address osteoarthritis. So the fact that insurers or payers and so many physicians nationwide is indicia of acceptance. Thousands of doctors nationwide. And in fact, one of the things that the Fourth Circuit did, it ignored all of that evidence of acceptance and determinations of acceptability by payers, who also have individuals who sit on their committees and make judgments about devices. That is evidence of acceptance within the scientific and medical community, Your Honor. And in fact, the district court ignored that widespread acceptance and said, well, the 26 affidavits from physicians, they're a boilerplate. Your Honor, each one of those affidavits, although it followed a similar format, was tailored and fit each individual physician's specific experience with that device. And their CVs are in the record. These are esteemed individuals across the country who signed affidavits. So if you talk about expert medical opinion, I submit that those individuals are experts in terms of the treatment of osteoarthritis of the knee. And all of these other physicians within the community have also expressed their opinion about the studies and whether this device is safe and effective and appropriate for Medicare beneficiaries. My next point, Your Honor, is that I also believe that Layton also found fault with the dismissal of the studies as simply mere puffery. He said that that is actually contrary to what the very provisions in 13.71 are, which clearly distinguished peer-reviewed literature from case reports which are distributed by sponsors. And unfortunately, the circuit court repeated that error and equated these studies in the peer-reviewed literature as case reports distributed by sponsors and said, well, the secretary can give whatever weight she wants to peer-review. And in fact, in those provisions, she clearly distinguishes between peer-review and case report. A case report distributed by a sponsor, Your Honor, that's like Marie Osmond losing 50 pounds on NutraSystem. That's very different than a clinical study with data analysis statistical powering. And so the Fourth Circuit simply dismissed that issue. Again, Your Honor, briefly, this case can be appreciated by looking at five documents. The HCPCS Code Administrative Record 21-899, which shows the necessary analysis conducted by CMS to say that the device was safe and effective, had achieved a substantial adoption. The secretary's explicit statements within the Federal Register and repeated that CMS adopts the FDA's determination. It's not a single sentence, Your Honor. There's an entire discussion discussing how she adopts both safety and effectiveness regardless of the regulatory pathway. I'd also urge you to look at MLN at 19-382, which is the directive to the contractors to pay for this device under individual consideration, which is exactly what they are doing, a directive that would be statutorily prohibited if the device weren't safe and effective and were experimental and investigational. And then fourthly, I'd like for you to look at the chart that begins at 21-013. And because this device was rented, Your Honor, you have a very graphic depiction of the checkerboard of coverage and payment of this device for particular Medicare beneficiaries. And if you start about the fourth beneficiary down, and then every other roughly, you will see that Medicare paid for multiple months for this device, then didn't pay for multiple months for this device, then paid for multiple months of this device. And then finally, Your Honor, I would urge you to look at the ALJ decisions, which issued before these cases, which continued to issue again, which we provided to this Court for consideration, and continue to issue today. Thank you. Your Honor, do I have 30 seconds left? You're beyond. Oh, I'm so sorry. Thank you, Your Honor. Thank you. I'll give you two minutes. Thank you. Just a few points. My colleague characterized the ALMI decision by the Fourth Circuit as addressing a different subject, as addressing whether there was a requirement for a national coverage determination. I would have to say, if you listen to the oral argument, that might be the impression you got. There was a lot of discussion of that. If you read the briefs, however, the issues are really on all fours. With this case and the way that you can tell that for sure is because the discussion of those issues in the Court's opinion is on all fours with the issues that are in this case. As to whether or not it is completely unprecedented for Medicare to deny coverage for a device when FDA has authorized it for marketing, it is not unprecedented. I point the Court to the Goodman case in the Second Circuit, which concerns MRIs. Obviously, that was a long time ago. They're now a very well-accepted part of medical treatment and diagnosis, but not at the time of that decision. Well, actually, at the time of that decision, but not at the time of the Medicare claim that was at issue there. And I'd also point the Court, with apologies for how complex it is, to the footnote in our brief about the ESA drugs, which are anemia treatments for cancer therapy patients. It shows that there is not complete congruence at all times between Medicare coverage and FDA marketing authorizations. As to HCPCS codes, I would point the Court again to the fact that there is an express disclaimer in the HCPCS code book which says that it's not to be interpreted as having any bearing on coverage. And we noted in our brief that there is a HCPCS code, for example, for hearing aids. Hearing aids are statutorily excluded from Medicare coverage. So there is no necessary translation from one to the other. And as to the question of whether RS Medical described and promoted this device for cartilage regeneration, we cited a great deal of material in our brief, principally the testimony of Dr. Zizek, who testified, I believe, in most of these proceedings. And kind of almost as an, well, it is an accident. You will find in the materials attached to our 20HA response, simply because it's there to explain who the witness is, the first page of Dr. Zizek's testimony in that particular hearing. And Judge Tacos, ALJ Tacos, asked Dr. Zizek at the very beginning of his testimony, from what I understand from everything I've read, the allegations in this case, is that the Bionicare 1000 or the device, whichever way we may want to refer to it, through the use of fluctuating electromagnetic waves or subcutaneously through the body, stimulates a portion of the knee that causes the regeneration of cartilage. Is that an accurate statement? Dr. Zizek says that's more or less correct, Your Honor. And he does go on in the subsequent pages, which are not attached to our filing. But that's one place that you can find it in the record. I think you're out of time. Thank you very much. I appreciate the arguments of all of you here. Thank you very much. This case is submitted.
judges: Kobayashi, Silverman, Murguia